## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES WILLIAM WILSON, JR.<br>MAUREEN ANN WILSON,<br><br>     Defendants. | | Criminal No. DKC-21-360 |

### UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF THE EVIDENCE................................................................... 3

    A.    Background ................................................................................................. 3

    B.    The Fraud Scheme ..................................................................................... 3

        i.     Life Insurance Applications ............................................................... 3

        ii.    Investors & Premium Payments.......................................................... 5

        iii.   Change of Owner and Change of Beneficiary Forms ........................ 6

        iv.   Death Claims....................................................................................... 6

        v.    Obstruction ......................................................................................... 7

    C.    Money Laundering...................................................................................... 7

    D.    Tax Crimes ................................................................................................. 9

III.   FIRST STEP ACT ............................................................................................. 9

IV.    SENTENCING GUIDELINES COMPUTATION.......................................... 11

V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) ............................. 20

    A.    18 U.S.C. § 3553(a)(1) – the nature and circumstances of the offense and the history and characteristics of the defendant. ............................................................. 20

    B.    18 U.S.C. § 3553(a)(2)(A) – the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment................................................. 23

    C.    18 U.S.C. § 3553(a)(2)(B) – the need to deter criminal conduct...................................... 23

    D.    18 U.S.C. § 3553(a)(6) – the need to avoid unwanted sentencing disparities. ................ 25

VI.    RESTITUTION................................................................................................. 26

VII.   CONCLUSION................................................................................................. 29

The United States of America, by its undersigned counsel, submits this Sentencing Memorandum as to Defendants James and Maureen Wilson.

## I.    INTRODUCTION

On January 23, 2025, a jury found James William Wilson, Jr. ("James Wilson") guilty of nineteen counts, including eight counts of mail fraud, four counts of wire fraud, conspiring to commit mail and wire fraud, two counts of concealment money laundering, conspiring to commit money laundering, two counts of filing false tax returns, and aggravated identity theft.  ECF No. 225.  On March 11, 2025, a jury found Maureen Ann Wilson ("Maureen Wilson") guilty of eleven counts, including four counts of mail fraud, two counts of wire fraud, conspiring to commit mail and wire fraud, spending money laundering, conspiring to commit money laundering, and two counts of filing false tax returns.  ECF No. 286.

The charges arose from James and Maureen Wilson's scheme to steal more than $20 million in life insurance proceeds from life insurance companies.  The Wilsons obtained more than 40 life insurance policies on several individuals by making material misrepresentations on the life insurance applications about the health, wealth, and existing life insurance coverage of the applicant.  Once they obtained the policies, the Wilsons forged the signatures of others to make themselves the owners and beneficiaries of the policies.  When two of the insureds died, the Wilsons received more than $8 million in life insurance proceeds.

Sentencing for both defendants is scheduled for June 30, 2025.  The Government is recommending the sentences list below.

1

James Wilson:

| Count | Charge | Years | Consecutive/Concurrent |
|-------|--------|-------|------------------------|
| 1 | Fraud Conspiracy | 18 | n/a |
| 2 | Mail Fraud | 18 | Concurrent |
| 3 | Mail Fraud | 18 | Concurrent |
| 4 | Mail Fraud | 18 | Concurrent |
| 5 | Mail Fraud | 18 | Concurrent |
| 6 | Mail Fraud | 18 | Concurrent |
| 7 | Mail Fraud | 18 | Concurrent |
| 8 | Mail Fraud | 18 | Concurrent |
| 9 | Mail Fraud | 18 | Concurrent |
| 10 | Wire Fraud | 18 | Concurrent |
| 11 | Wire Fraud | 18 | Concurrent |
| 12 | Wire Fraud | 18 | Concurrent |
| 13 | Wire Fraud | 18 | Concurrent |
| 14 | Money Laundering Conspiracy | 10 | Concurrent |
| 15 | Money Laundering | 10 | Concurrent |
| 16 | Money Laundering | 10 | Concurrent |
| 18 | Filing False Tax Return | 3 | Concurrent |
| 19 | Filing False Tax Return | 3 | Concurrent |
| 20 | Agg. Identity Theft | 2 | Consecutive |

Maureen Wilson:

| Count | Charge | Years | Consecutive/Concurrent |
|-------|--------|-------|------------------------|
| 1 | Fraud Conspiracy | 10 | n/a |
| 5 | Mail Fraud | 10 | Concurrent |
| 6 | Mail Fraud | 10 | Concurrent |
| 7 | Mail Fraud | 10 | Concurrent |
| 8 | Mail Fraud | 10 | Concurrent |
| 12 | Wire Fraud | 10 | Concurrent |
| 13 | Wire Fraud | 10 | Concurrent |
| 14 | Money Laundering Conspiracy | 10 | Concurrent |
| 17 | Money Laundering | 10 | Concurrent |
| 18 | Filing False Tax Return | 3 | Concurrent |
| 19 | Filing False Tax Return | 3 | Concurrent |

In substance, the Government is recommending a 20-year sentence as to James Wilson and a 10-year sentence as to Maureen Wilson. The Government is further requesting three years of supervised release and a $100 special assessment for each count as to both defendants. The Government further requests the Court order restitution totaling **$21,466,341.32** to be paid to the

victims in this case.  The Government addressed forfeiture in separate filings, ECF Nos. 305 and 308, and requests the Court enter the proposed Preliminary Order of Forfeiture.  Finally, to ensure restitution to victims, the Government does not seek imposition of a fine in this case.

## II.    SUMMARY OF THE EVIDENCE

### A.  <u>Background</u>

Defendant James William Wilson, Jr. was an agent licensed to sell life insurance in Maryland.  Wilson also owned an insurance business, AWA, Inc.  Wilson's wife, Defendant Maureen Ann Wilson, was a former investment manager and registered broker-dealer.  The Wilsons resided in Owings Mills, Maryland.

From in or around June 1993 through December 2018, James Wilson procured at least 44 life insurance policies worth approximately $25,000,000.  *See* Total Policies Obtained, Exhibit No. 519.[1]  To procure these policies, James Wilson misrepresented the health, wealth, and amount of existing insurance coverage on the applications.  After obtaining the applications, the Wilsons used forged signatures to make themselves and other nominees that they controlled the owners and beneficiaries of the policies.  When the insureds died, the Wilsons personally obtained over $8.7 million in life insurance proceeds.

### B.  <u>The Fraud Scheme</u>

#### i.    *Life Insurance Applications*

The process of obtaining life insurance begins with an application.  The application asks questions about the health and wealth of the applicant, as well as about the amount of existing life insurance coverage.  Multiple witnesses from various life insurance companies testified that these

---

[1] The Government is not re-submitting trial exhibits which are already part of the record.  New exhibits submitted herein will be noted as "Sentencing Exhibits."

factors were all material to evaluating an application.  *See, e.g.*, Trial Tr. K. Pounds, ECF No. 236 at 11–14.

The trial evidence showed that James Wilson misrepresented the health of the applicants by claiming that the applicants were non-smokers when in fact they were smokers.  For example, James Wilson wrote that Thomas and John Stevens were non-smokers when they were both smokers.  *See*, *e.g.*, Lincoln Benefit Appl., Exhibit 160; T. Stevens Hospice Note, Exhibit 428. For certain policies, the life insurance companies required a paramedical evaluation performed by an independent evaluator and a urine sample.  James Wilson paid a paramedical evaluator to complete medical evaluation forms for Thomas and John Stevens without evaluating them.  James Wilson also provided urine specimens to the paramedical evaluator.

James Wilson also misrepresented the wealth of the applicant.  For example, in most applications for Thomas Stevens, Stevens is listed as having a six-figure annual income and seven-figure net worth.  *See* Exhibit 525.  The trial evidence showed that Thomas Stevens earned less than $20,000 per year and had no assets other than his house.  *See* Reverse Mortgage App., Exhibit 417.

James Wilson also misrepresented the amount of existing coverage of the applicant.  For example, the Government showed that, on a life insurance application to Lincoln Benefit Life in 2006 for Thomas Stevens, James Wilson disclosed that Stevens had three existing life insurance policies worth approximately $750,000.  *See* Exhibit 160.0002.  In fact, Thomas Stevens had 20 life insurance policies worth more than $10 million in existence at the time.  *See* Exhibit 525.

James Wilson used another insurance producer to procure life insurance policies for various applicants.  Multiple life insurance witnesses testified that it can be a red flag if an insurance producer is also the beneficiary of the policy.  *See*, *e.g.*, ECF No. 236 at 14–15.  By

using another producer, James Wilson was able to make himself the beneficiary of certain life insurance policies.  *See* Exhibit 517.

ii.    *Investors & Premium Payments*

Once an insurer issues coverage, premium payments are required to keep the policy in force.  To manage the cost of the premium payments, the Wilsons solicited investors.  The investors were often the friends and family of the Wilsons.

Tracey Wise ("Wise") is the Wilsons' niece.  Wise testified that in 2011 or 2012, she had saved enough money to purchase a restaurant or coffee shop.  Trial Tr. T. Wise, ECF No. 237 at 12–15.  She told friends and family of her plans at a holiday party that the Wilsons also attended. *Id.* at 12-13.  Soon after her announcement, James and Maureen Wilson called Wise and convinced her to invest in a "death bond."  *Id.* at 13-15.  Over the next several years, Wise proceeded to make payments towards the death bond, and she ultimately gave the Wilsons all of her savings.  *See* Wise Payment Notes, Exhibit 475; ECF No. 237 at 41 ("It's my life savings.").  Wise's best friend, Carrmen Motto, and girlfriend, Jessica Merriam, also made payments towards the death bond.

Janet Isherwood was a former client of Maureen Wilson.  At a meeting, Maureen Wilson encouraged Isherwood to invest in the scheme.  Other investors included Maureen Wilson's brother, William Fitzpatrick, Doris Wilhelm, Wilhelm's daughter Sandra Ruhl, and Roger Bennett.

James Wilson was a trustee of the Raymond J. Whitaker Trust.  A purpose of the trust was to care for Paul Whitaker and, upon his passing, provide funds to the University of Albany.  James Wilson approached the co-trustee of the trust to obtain a loan from the trust that would be used to pay insurance premiums.  Wilson repaid the initial loan.  Subsequently, however, James Wilson took an additional $100,000 from the trust, without the co-trustee's knowledge, to pay insurance premiums.

###### iii. *Change of Owner and Change of Beneficiary Forms*

At the time that a life insurance policy is issued, there must be an insurable interest between the proposed insured and the beneficiaries. After an insurance policy is in effect, however, the owner of a life insurance policy may transfer or change the policy owner and/or beneficiary. When James Wilson supplied the life insurance applications, the owner and beneficiary was typically the insured's spouse or child. After the policies were issued, however, the Wilsons used forged signatures to make themselves and other nominees the owners and beneficiaries of the policies. The trial evidence included several change of ownership and beneficiary forms that contained forged signatures of Millie Stevens, who was dead, and Tracey Wise. *See* Exhibit 133.0007–8 (forged Millie Stevens and Wise signatures). James Wilson even maintained a copy of Wise's driver's license on his computer that had his forged version of her signature imposed on the license. *See* ECF No. 237 at 54-55.

The trial evidence showed that James Wilson caused interstate wires to be sent with respect to the charged wire fraud counts in Counts 10 through 13 of the Indictment. Maureen Wilson caused interstate wires to be sent with respect to the charged wire fraud counts in Counts 12 and 13 of the Indictment.

###### iv. *Death Claims*

Once an insured passes away, a death claim may be made to obtain a payout on the life insurance policy. The trial evidence showed that James Wilson caused death claims to be delivered as alleged in Counts Two through Nine of the Indictment. Counts Three and Four related to death claims submitted in the names of Wise and Motto, respectively. *See* Exhibits 138, 151, and 524. James Wilson opened joint bank accounts with both Wise and Motto. James Wilson told them that the accounts were for Wise and Motto to manage the Wilsons' financial affairs when they pass

6

away.  In fact, James Wilson used those accounts to deposit life insurance proceeds payable to Wise and Motto as Wilson's nominees into accounts that he controlled.  Count Three corresponds to aggravated identity theft, Count 20.  Maureen Wilson caused death claims to be delivered as alleged in Counts Five through Eight of the Indictment.

> v.    *Obstruction*

The trial evidence showed that, after Wise and Motto began to raise questions with James Wilson about his conduct, he attempted to influence and intimidate them.  For example, James Wilson advised Wise that they all needed to get the same lawyer so they could all "sing from the same sheet of music."  ECF No. 237 at 40.  James Wilson asked Wise to say that she gave permission to forge her signature or to say that she had signed the documents.  *Id.* at 42.  James Wilson also advised that he was planning on giving Motto $200,000, and all Motto had to do was say that she had given him the money to manage.  *Id.* at 40-41.  James Wilson also offered to leave Wise $500,000 in his will.  *Id.* at 43.  Wise testified that she viewed this to be a bribe.  *Id.*

## C.  Money Laundering

Proceeds of the life insurance policies were deposited into bank accounts owned or controlled by James Wilson and Maureen Wilson.  The Wilsons rapidly moved funds between accounts they owned or controlled, or the funds were used for personal expenditures.  *See* Tracing Chart, Exhibit 524.  The Wilsons often moved money across multiple accounts for no apparent, legitimate reason.  *See id.*

For example, on February 28, 2020, James Wilson wrote a personal check to himself for $4.3 million drawn on his Bank of America account ending in 3633.  *Id.*  James Wilson used this personal check to purchase three cashier's checks totaling the same amount.  *Id.*  Two of the three checks were in Maureen Wilson's name.  On or about March 18, 2020, James Wilson then

7

deposited all three checks into the PNC Bank account ending in 0609. *Id.* Two of those cashier's checks are the subjects of Counts 15 and 16 in the Indictment. The Wilsons transferred the funds from the cashier's checks out of their PNC account later that month. *Id.*

Another example, on November 6, 2019, a life insurance payment to Motto for $2,007,918.68 was deposited into a BB&T account that James Wilson controlled. The next day, James Wilson transferred two $500,000 payments into the Wilsons' joint BB&T account. That same day, Maureen Wilson wrote a $500,000 check from that BB&T account and deposited the check into her Charles Schwab investment account. This last check was the subject of Count 17 of the Indictment.

James Wilson also enlisted the services of an estate planning and asset protection attorney, James List ("List"), to set up two revocable trusts bearing the names of relatives, The Jean Peck Revocable Trust and The Elsie Fitz Revocable Trust. The Wilsons were grantors for the trusts. Maureen Wilson's brother, William Fitzpatrick, was the trustee for both trusts. Other than in the trust paperwork, which was not publicly available, the Wilsons' names did not appear on any documents or accounts.

James Wilson created multiple financial accounts for the trusts. Although the accounts were in the name of Fitzpatrick as trustee, James Wilson controlled the accounts. James Wilson impersonated Fitzpatrick during a phone call with Interactive Brokers.

The Wilsons also used List to create a sham lien to limit the amount of equity in their home that might be available to creditors. Jeffrey Miller, through an LLC, "loaned" the Wilsons, through another LLC, $500,000, repayment of which loan was guaranteed with a deed of trust on the Wilsons' primary residence in Owings Mills, Maryland. In reality, the Wilsons provided the $500,000 to Miller, which he returned to them shortly after receiving it. *See* Exhibit 524.

8

### D. **Tax Crimes**

The Wilsons prepared, signed, and paper-filed their returns without the assistance of a return preparer. The Wilsons did not report life insurance proceeds received during tax year 2018 or 2019. The taxable income reported on their joint 2018 tax return was $16,750. Their actual taxable income, including the proceeds they received from their life insurance fraud scheme, was $5,746,356. *See* Exhibit 517A. The income reported on their joint 2019 tax return was $4,283. Their actual taxable income, including the proceeds they received from their life insurance fraud scheme, was $2,050,847. *See id.* Both James and Maureen Wilson knew at the time they signed their returns that they had not reported the proceeds of the fraud scheme. The Wilsons' failure to report income for tax years 2018 and 2019 is the subject of Counts Eighteen and Nineteen of the Indictment.

### III.    **FIRST STEP ACT**

Given the Defendants' age and the provisions of the First Step Act ("FSA"), the United States Sentencing Guidelines, and the Bureau of Prison's implementing Program Statements, it is unlikely that James or Maureen Wilson will serve the full terms of their sentence. The FSA amended 18 U.S.C. § 3621, which governs the calculation of federal prison sentences. Section 102(b) of the FSA also amended 18 U.S.C. § 3624(b), allowing federal inmates to earn additional good time credits. *Knight v. Bell*, No. JKB-20-3108, 2021 WL 1753791, at *3 (D. Md. May 4, 2021). The FSA, among other things, allows the BOP to award inmates a maximum of fifty-four (54) days of good time credits per year of their imposed sentence rather than fifty-four (54) days of credit per year of their sentence served. *See Pizarro v. White*, No. 1:19-cv-343, 2019 WL 1922437, at *1 (M.D. Pa. Apr. 30, 2019). Under the FSA, inmates are also eligible to earn up to fifteen (15) days of time credits for every thirty (30) days of successfully completed BOP-approved

recidivism reduction programming.  18 U.S.C. § 3632(d)(4)(A).  These time credits make inmates eligible, at the discretion of the BOP, for various incentives and rewards for successful completion, including time credit applied toward time in prerelease custody or supervised release.  *See* 18 U.S.C. §§ 3632(d)(1)–(4)(C).

Additionally, the Court is likely aware of the compassionate release provisions of the FSA, which provides the inmate the opportunity to seek a sentencing reduction upon the presentation of "extraordinary and compelling circumstances."  18 U.S.C. § 3582(c)(1)(A)(i).  The Sentencing Guidelines further provide that "extraordinary and compelling circumstances" include when a defendant is, "(A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13(b)(2); *see also* BOP Program Statement 5050.50, at 6, https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  As a further implementation of the FSA and the compassionate release provisions, BOP has adopted the following criteria for a reduction in sentence:  "■ Age 65 and older. ■ Suffer from chronic or serious medical conditions related to the aging process. ■ Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility. ■ Conventional treatment promises no substantial improvement to their mental or physical condition. ■ Have served at least 50% of their sentence."  *Id.*  The 50% figure takes into account the good-time credits and other credits that an inmate accrues during incarceration.

Life expectancy is not a criteria to be considered under § 3553(a), but in the case of older defendants facing significant sentences, it is difficult to ignore this factor.  The FSA, however, gives the Court the freedom to impose a fair sentence without consideration of whether the sentence is a "life sentence."

10

## IV.     SENTENCING GUIDELINES COMPUTATION

The Government's computation of James Wilson's sentencing guidelines is as follows:

**Fraud Guidelines**

| | |
|---|---|
| Base Offense Level, § 2B1.1(a)(1): | 7 |
| Loss Enhancement, § 2B1.1(b)(1)(k): | 20 |
| Ten or More Victims, § 2B1.1(b)(2)(A)(i): | 2 |
| Sophisticated Means, § 2B1.1(b)(10)(C): | 2 |
| $1 million in gross receipts, § 2B1.1(b)(17)(A): | 2 |
| Involves broker-dealer and violation of securities laws § 2B1.1(b)(20)(A):[2] | 4 |
| Organizer, Otherwise Extensive, § 3B1.1(a): | 4 |
| Obstruction Enhancement, § 3C1.1: | 2 |
| Total: | 43 |

**Money Laundering Guidelines**

| | |
|---|---|
| Base Offense Level, § 2S1.1(a)(1): | 37 |
| Concealment Money Laundering, § 2S1.1(b)(2)(B): | 2 |
| Sophisticated Laundering, § 2S1.1(b)(3): | 2 |
| Organizer, Otherwise Extensive, § 3B1.1(a): | 4 |
| Obstruction Enhancement, § 3C1.1: | 2 |
| Total: | 47 |

---

[2]     James Wilson's solicitation of investors by phone, in particular Wise and Motto, constituted the unlawful sale of an unregistered security in violation of 15 U.S.C. § 77e.  Maureen Wilson was a registered broker dealer.   When this Guideline enhancement applies, the Court does not apply the Abuse of Position of Trust or Use of Special Skill enhancement in § 3B1.3.

**Organizer, Otherwise Extensive, § 3B1.1(a)**

U.S. Probation did not apply the Organizer Enhancement. The facts established at trial demonstrate the applicability of this enhancement.

The enhancement applies if "the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive." U.S.S.G. § 3B1.1(a). The Commentary provides guidance for determining whether the criminal activity was "otherwise extensive." *Id.* at cmt. 3. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.*

The trial evidence supports imposing this enhancement. James Wilson and his wife engaged in a decades-long conspiracy to obtain millions of dollars in life insurance coverage from multiple life insurance companies. Wilson paid a paramedical evaluator, Michael Cherigo, to complete paramedical exam evaluation forms without examining the applicant. The first sham medical evaluation form was dated in 1993. Wilson also used another insurance broker, William Zemitis, to submit life insurance applications so that Wilson could make himself the beneficiary of the policy without any scrutiny from the life insurance company. Although the Government has not taken a position as to the status of the Stevens family, the evidence showed that Wilson controlled access to the Stevens family, to include submitting applications in the names of Thomas and John Stevens, and submitting ownership and beneficiary changes that would ultimately cause the disbursement of millions of dollars in life insurance proceeds to the Stevens family. Wilson and his wife also convinced several investors (Wise, Motto, Merriam, Isherwood, Ruhl) to invest in the policies without explaining the truth as to the investment. The trial evidence showed that

12

Wilson submitted 44 life insurance applications in furtherance of his scheme, and the Government introduced dozens of change of ownership and beneficiary forms that contained false representations and forged signatures.

James Wilson was also convicted of conspiring with his wife to launder money (Count 14). To facilitate the money laundering, the Wilsons also relied on other participants in the scheme, as summarized in the table below:

| Individual | Role |
|---|---|
| William Fitzpatrick | William Fitzpatrick was a nominee owner of trust accounts that the Wilsons used to launder insurance fraud proceeds. |
| James List | James List was an attorney who James Wilson used to launder fraud proceeds through an escrow account.  The fraud proceeds were then placed into trusts by List.  Additionally, List's services were used to place a lien against the Wilsons' home, thereby reducing the equity value in the home available to creditors.  Shell companies and a friend of the Wilsons, Jeffrey Miller, were used to fabricate a loan arrangement, which was guaranteed by the Wilsons' home. |
| Jeffrey Miller | Jeffrey Miller was a friend of the Wilsons, who aided the Wilsons in laundering fraudulent proceeds through his M&T Bank account into trust accounts controlled by the Wilsons. |

Examining the nature of James Wilson's fraud scheme and all persons involved during the course of the entire offense, his conduct qualifies as "otherwise extensive."  Moreover, the application of the Organizer Enhancement precludes the two-level "Zero-Point Offender" reduction.  U.S.S.G. § 4C1.1(a)(10).

**Obstruction Enhancement, U.S.S.G. § 3C1.1**

Probation also did not apply the Obstruction Enhancement.  The facts established at trial demonstrate the applicability of this enhancement.

The Obstruction Enhancement applies:

[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct

related to (A) the defendant's offense of conviction and any relevant conduct; or
(B) a closely related offense . . . .

U.S.S.G. § 3C1.1. "Obstructive conduct can vary widely in nature, degree of planning, and seriousness." *Id.* at cmt. 3. The non-exhaustive list of examples of covered conduct includes:

(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;
. . .

(D) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so . . .

*Id.* at cmt. 4. Under U.S.S.G. § 2S1.1, Chapter Three Adjustments are determined in reference to the laundering of criminally derived funds. U.S.S.G. § 2S1.1 cmt. 2(C).

Motto and Wise were investors in a life insurance policy produced by Wilson. ECF No. 237 at 16. Motto and Wise were also nominees on BB&T bank accounts that Wilson used to launder the fraudulently obtained funds from Nationwide. The fraud proceeds were ultimately moved between multiple bank accounts before being deposited into the PNC account related to Counts 15 and 16. Motto received a letter from Nationwide in reference to a payout for a death claim. *Id.* at 27. James Wilson instructed Motto to throw the letter away. *Id.* at Line 15. Motto was subsequently served with a lawsuit in reference to a life insurance policy involving James Wilson. *Id.* at 29, Lines 13-23. Motto, Wise, and Jessica Merriam went to confront the Wilsons in reference to this lawsuit. *Id.* at 32-33.

Thereafter, James Wilson told Wise that they all needed to get the same lawyer so they could all sing from the same sheet of music. *Id.* at 40, Lines 21-23. James Wilson asked Wise to say that she gave permission to forge her signature or to say that she had signed the documents. *Id.* at 42, Lines 8-11. James Wilson stated that if they didn't get their stories right, Wise's investment would go to hell. *Id.* at 41, Lines 8-9. James Wilson also advised that he was planning

on giving Motto $200,000, and all Motto had to do was say that she had given him the money to manage. *Id.* at 41-42. James Wilson also offered to leave Wise $500,000 in his will. *Id.* at 43, Lines 10-15. Wise testified that she viewed this to be a bribe. *Id.* at Line 18.

The above facts demonstrate that James Wilson encouraged Motto to destroy evidence. The facts further demonstrate that James Wilson attempted to influence both Motto and Wise. This conduct constitutes obstruction and falls within the examples of covered conduct set forth in U.S.S.G. § 3C1.1.

### Tax Guidelines

| | |
|---|---|
| Base Offense level, §§2T1.1(a) and 2T4.1: | 22 |
| Failed to report excess of $10,000, §2T1.1(b)(1): | 2 |
| Sophisticated means, §2T1.1(b)(2): | 2 |
| Total: | 26 |

### Aggravated Identity Theft

| | |
|---|---|
| Aggravated Identity Theft, 18 U.S.C. 1028A, § 2B1.6: | 24 months consecutive |

### Grouping

Counts One through Thirteen and Fourteen through Sixteen are grouped under U.S.S.G. §3D1.2(d), resulting in a **total offense level of 47** under U.S.S.G. §3D1.3. Moreover, Counts Eighteen and Nineteen form a separate "tax" group under U.S.S.G. §3D1.2(d). This "tax" group is nine or more levels lower than the fraud and money laundering group, however, and is, therefore, disregarded under U.S.S.G. §3D1.4.

The Government calculated Maureen Wilson's sentencing guidelines as follows:

### Fraud Guidelines

| | |
|---|---|
| Base Offense Level, §2B1.1(a)(1): | 7 |

15

| | |
|---|---|
| Loss Enhancement, §2B1.1(b)(1)(k): | 20 |
| Ten or More Victims, §2B1.1(b)(2)(A)(i): | 2 |
| Sophisticated Means, §2B1.1(b)(10)(C): | 2 |
| $1 million in gross receipts, §2B1.1(b)(17)(A): | 2 |
| Involves broker-dealer and violation of securities laws §2B1.1(b)(20)(A): | 4 |
| Total: | 37 |

**Money Laundering Guidelines**

| | |
|---|---|
| Base Offense Level, §2S1.1(a)(1): | 37 |
| Concealment Money Laundering, §2S1.1(b)(2)(B): | 2 |
| Sophisticated Laundering, §2S1.1(b)(3): | 2 |
| Total: | 41 |

**Tax Guidelines**

| | |
|---|---|
| Base Offense level, §§2T1.1(a) and 2T4.1: | 22 |
| Failed to report excess of $10,000, §2T1.1(b)(1): | 2 |
| Sophisticated means, §2T1.1(b)(2): | 2 |
| Total: | 26 |

**Grouping**

Counts One through Seventeen are grouped under U.S.S.G. §3D1.2, resulting in a **total offense level of 41** under U.S.S.G. §3D1.3.  Moreover, Counts Eighteen and Nineteen form a separate "tax" group under U.S.S.G. §3D1.2(d). This "tax" group is nine or more levels lower than the fraud and money laundering group, however, and is, therefore, disregarded under U.S.S.G. §3D1.4.

**Sophisticated Laundering Enhancement, U.S.S.G. § 2S1.1(b)(3)**

16

**Tax Sophisticated Means Enhancement, U.S.S.G. § 2T1.1(b)(2)**

Neither the Sophisticated Laundering Enhancement nor the Tax Sophisticated Means Enhancement were included in the PSR calculations.  Each of these enhancements applies to the Wilsons' conduct.

The Sophisticated Laundering Enhancement can apply if a Defendant was convicted under 18 U.S.C. § 1956.  U.S.S.G. §2S1.1(b)(3).  "Sophisticated laundering typically involves the use of— . . . (ii) shell corporations; [or] (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate . . . ."  *Id.* at cmt. 5.  .  "Each of a defendant's individual actions need not be sophisticated to warrant a sophisticated means enhancement."  *United States v. Noel*, 502 F. App'x 284, 290 (4th Cir. 2012) (concluding that sophisticated money laundering enhancement applied where defendant lied to investors and financial institutions in order to perpetuate and conceal three-year fraud scheme).

The facts of this case demonstrate the applicability of the Sophisticated Laundering Enhancement.  The Wilsons were convicted of Conspiracy to Violate the Money Laundering Statutes, 18 U.S.C. § 1956(h) (Count 14).  James Wilson was convicted of two counts of Concealment Money Laundering, 18 U.S.C. § 1956 (Counts 15-16).  Maureen Wilson was convicted of one count of Spending Money Laundering, 18 U.S.C. § 1957 (Count 17).  Fraud proceeds were traced from multiple insurance companies into the joint accounts of James and Maureen Wilson, sometimes moving through multiple intermediate accounts.  The funds were then transferred from the Wilsons' joint PNC account into the escrow account of an attorney, James List.  James Wilson had List create two trusts, and laundered funds into four financial accounts in

the names of the two trusts.  James Wilson was the grantor of the Jean Peck Revocable Trust.
Maureen Wilson was the grantor of the Elsie Fitz Revocable Trust.

The Wilsons also assisted in the creation of a sham lien on their home, involving the use
of two shell companies, signing as the guarantors for an indemnity deed of trust.  Funds related to
the indemnity deed of trust were transferred from the attorney's escrow account into the account
of Jeffrey Miller at James Wilson's direction.  The funds were then transferred back into trust
accounts the Wilsons controlled.  Below is a graphic representation of one part of one example of
the Wilsons' sophisticated money laundering:



In addition to creating revocable trusts bearing other people's names to accomplish the money laundering, James Wilson also used a nominee, William Fitzpatrick, in relation to brokerage accounts for the trust.

The facts demonstrate the use of shell corporations, the use of multiple levels of layering, the use of nominees, the use of trust accounts, and the use of professionals. All of which demonstrate sophisticated money laundering. For similar reasons, the Tax Sophisticated Means Enhancement should also apply. *See* U.S.S.G. § 2T1.1(b)(2) & cmt. 5.

**Zero-Point Offender Reduction, U.S.S.G. § 4C1.1**

Probation applied a two-level reduction for Maureen Wilson being a zero-point offender. However, such reduction is not appropriate if the defendant personally caused substantial financial hardship. U.S.S.G. §4C1.1(a)(6) & cmt. 1. In determining whether the offense caused substantial financial hardship, the Court is required to consider, among other factors, a victim suffering a substantial loss to a savings fund. U.S.S.G. §2B1.1 cmt. 4(F)(iii).

The summary of Maureen Wilson's Offense Conduct provides:

> Tracey Wise ("Wise") is Wilson's niece. Wise testified that in 2011 or 2012, she had saved enough money to purchase a restaurant or coffee shop. She told friends and family of her plans at a holiday party that was attended by the Wilsons. Soon after her announcement, James and Maureen Wilson called Wise and convinced her to invest in a "death bond." Over the next several years, Wise proceeded to make payments towards the death bond, **and ultimately gave the Wilsons all of her money**. Wise's best friend, C.M., and girlfriend, J.M., also made payments towards the death bond.

ECF No. 307 at 5 ¶ 12 (emphasis added). *See also* ECF No. 237 at 41 ("Q. Were you concerned about losing your investment? A. Yeah, of course. It's my life savings. I've been saving that up since I was 23."). Considering that Maureen Wilson directly contributed to her own niece losing her life savings, she does not meet the criteria to qualify as a zero-point offender. *See, e.g.*, <u>*United States v. Hanson*</u>, 124 F.4th 1013, 1018 (7th Cir. 2025) (upholding district court's application of §

4C1.1(a)(6) where "at least one victim" suffered substantial hardship because his bank accounts were "abruptly closed" due to the defendant's fraudulent activity).

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### A.     18 U.S.C. § 3553(a)(1) – the nature and circumstances of the offense and the history and characteristics of the defendant.

As to the nature and circumstances of the offense, the Wilsons' criminal scheme spanned decades, consisted of multiple frauds, and involved the exploitation of those who trusted them. As for the duration of the scheme, the first fake Michael Cherigo medical exam was from 1993. The first life insurance payout to Tracey Wise that she never received was in 2004.

Their fraud was also complex and nuanced. First, James Wilson had to manipulate the application process, but he knew he could not do that alone because of the need for a paramedical exam and urine testing. So he enlisted Michael Cherigo to complete the paramedical exam paperwork without performing the exam. James Wilson even brought Cherigo the urine to be tested. The urine was always free from nicotine even though Thomas Stevens smoked two packs of cigarettes per day for his entire adult life. When James Wilson needed to inflate Ali and Vilma Baykayler's net worth, he had his brother-in-law, William Fitzpatrick, prepare a financial statement that listed a one-level ranch-style home worth more than $1 million.

For the scheme to work, James Wilson also needed to perform his own actuarial analysis to ensure that the insureds would die faster than the life insurance companies anticipated. Wilson obtained life-expectancy evaluations for John Stevens and Vilma Baykayler. Vilma Baykayler testified during Wilson's trial that he would call her house periodically. Wilson was calling to see if she would die soon. Mrs. Baykayler, however, did not die, which made the Wilsons' bet on her life a losing one.

Once Wilson obtained the policies, he needed to make the premium payments. For that, the Wilsons turned to Maureen's family and professional contacts, among others. Maureen Wilson's brother, William Fitzpatrick, invested in the scheme. Maureen Wilson was Raymond Whitaker's and Janet Isherwood's stockbroker.

As the Court observed during trial, the Wilsons' abuse of Mrs. Wilson's niece, Tracey Wise, was particularly callous. Wise managed several restaurants in Baltimore, and by 2011, she and Carrmen Motto had saved enough money to open a restaurant or coffee shop of their own. Ms. Wise informed her family of her plans at a family holiday gathering the Wilsons also attended. When the Wilsons heard that Wise had money to invest, they pounced. Soon after the holiday gathering, Mr. and Mrs. Wilson called Wise and Motto and dissuaded them from opening a restaurant. Instead, they told her that they had an opportunity for them to invest in a "death bond." For the next nine years, Wise would give the Wilsons all of her savings – more than $100,000 – and she eventually had to obtain money from Jessica Merriam to pay the annual premium payments.

Additionally, to execute their scheme, the Wilsons had to make themselves the owners and beneficiaries of the policies, either directly or indirectly. They accomplished this by forging signatures and stealing identities. The Court saw multiple instances where change of ownership and beneficiary forms were signed by Millie Stevens after she died. Wilson knew that Millie Stevens had died because he mailed the death claim to the life insurance company. Maureen Wilson called a life insurance company pretending to be Millie Stevens. The trial evidence included multiple instances of Tracey Wise's forged signature. In addition to stealing her money, the Wilsons made Wise the owner and beneficiary of multiple life insurance policies without her knowledge. Wilson created an email account to communicate as if he were Tracey Wise, and he

kept two versions of her driver's license on his computer; one with the word "Real" in the file name and one with the words "My Sign" in the file name.

When asked at Mr. Wilson's trial what it felt like to realize that she had been victimized in this way, Wise testified, "It's devastating. You wonder if all of it was a lie, is it all just a grooming technique. What was real, what wasn't real. . . . I just don't know how you could do this to me or Carrmen. I don't understand how you do it." ECF No. 237 at 57. At Mrs. Wilson's trial, Wise testified, "It's a betrayal on so many levels. . . . No more Thanksgivings, no more Christmases. Everything, it's all done." ECF No. 301 at 63.

Finally, once Thomas and John Stevens died, the Wilsons received approximately $8 million in life insurance proceeds. In addition to using those proceeds to fund their opulent lifestyle, the Wilsons did not pay any taxes and engaged in an elaborate money laundering scheme where funds were repeatedly moved through bank accounts and, ultimately, ended in bank accounts in the name of two sham trusts formed with the assistance of an attorney, James List.

As for the history and characteristics of the defendants, the evidence at trial showed that the defendants did not need to commit these crimes in order to live a comfortable life. In addition to having a life insurance business, James Wilson was also the president of a car insurance company, Paramount Insurance. Maureen Wilson was a stockbroker. Wise testified about Maureen Wilson's career, "[I]t was nice to see honor, especially like my aunt who didn't go to college, but she got the Series 7 and was acknowledged for being so brilliant and sprung right up to the top." ECF No. 237 at 8. She also testified that Maureen Wilson was her "role model," and that "she's powerful. . . . [She] fought tooth and nail to get to where she was, working her ass off. Strong woman." *Id.* at 56.

22

The trial evidence showed the defendants committed fraud, not because of any financial burden, but because of their desire to live an astonishingly opulent lifestyle. Maureen Wilson possessed more than 600 pairs of luxury shoes, dozens of luxury purses, and a large safe filled with jewelry. The Wilsons decorated their house with ornate furnishings and had shelves of antiques in their basement. The jury saw evidence of purchases at Chanel, Bergdorf Goodman, and other luxury retailers and jewelers. The Wilsons had the talent and experience to legitimately earn a comfortable living. Instead, they chose to commit fraud so that they could live a life beyond their means. For this conduct, the Court should impose the Government's requested sentence.

**B.  18 U.S.C. § 3553(a)(2)(A) – the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.**

The Court should impose a significant sentence in this case to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment. As explained in the previous section and as proven at trial, the Wilsons demonstrated a callous disrespect for the rule of law, defrauding life insurance companies, the Internal Revenue Service ("IRS"), and their friends and family. Their fraud, which spanned three decades, deserves a corresponding serious sentence.

**C.  18 U.S.C. § 3553(a)(2)(B) – the need to deter criminal conduct.**

The Court's sentence should send a deterrent message to those who seek to commit life insurance fraud. Life insurance scams similar to the one perpetrated by the Wilsons are a known risk in the life insurance industry and have been prosecuted by the Department of Justice. *See United States v. Williamson*, Case No. 1:17-cr-00987-JFA (D.S.C.), *United States v. Sherlock*, 1:16-cr-00632 (D.S.C.); United States v. Mercier, 1:18-cr-00617 (D.S.C.).

Additionally, this prosecution has resonated in the insurance community. Soon after Mr. Wilson's conviction, counsel for John Hancock emailed the Government an article from an

23

industry publication that published the conviction.  *See* Sentencing Exhibit A, Fraudster Convicted

for $20M Insurance Fraud Scheme.  The National Insurance Crime Bureau and AM Best have also

published articles about the case.[3]  The Court's sentence will resonate in the life insurance industry,

and the Court should send a deterrent message.

It is critical that "white-collar" offenders not view the rewards of fraud, money laundering,

and tax crimes as outweighing the risks of being punished.  "Because economic and fraud-based

crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these

crimes are 'prime candidate[s] for general deterrence.'  Defendants in white collar crimes often

calculate the financial gain and risk of loss, and white collar crime therefore can be affected and

reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)

(quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47

WM. & MARY L. REV. 721, 724 (2005)).  The Sentencing Commission has noted that, in tax

cases, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated

incidence of such violations, deterring others from violating the tax laws is a primary consideration

underlying th[e] guidelines." U.S.S.G. ch. 2, pt. T, introductory cmt.  The Fourth Circuit agrees:

> [W]e believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2011).  This same reasoning applies to fraud

and money laundering cases.

---

[3] *See* https://www.nicb.org/news/regional-news/maryland-woman-convicted-20m-insurance-fraud-scheme;  https://news.ambest.com/newscontent.aspx?refnum=263804&altsrc=23.

24

**D.  18 U.S.C. § 3553(a)(6) – the need to avoid unwanted sentencing disparities.**

The Government is recommending the Court sentence James Wilson to 20 years of incarceration and Maureen Wilson to 10 years of incarceration, which is consistent with the Government's view of the relative culpability of the defendants.  Mr. Wilson was the most-critical actor in the scheme.  He orchestrated all of the applications, the false medical evaluations, many of the change of ownership and beneficiary forms, and he was the primary actor in the money laundering scheme.  Mrs. Wilson, a registered broker-dealer, helped Mr. Wilson solicit investors to pay the premiums, and she called insurance companies – sometimes as herself, sometimes as other people – to perpetuate the scheme.

The Government has also identified several cases in this District where significant sentences have been imposed in white collar cases:

- ***United States v. Kevin Merrill & Jay Ledford,*** RDB-18-0465:  Ponzi scheme with a loss of $396 million.  Both defendants pleaded guilty.  Merrill was sentenced to 22 years of incarceration and Ledford was sentenced to 14 years of incarceration.

- ***United States v. Dawn Bennett*** (PX-17-0742):  Ponzi-type investment fraud scheme that resulted in losses of $14.504 million, including the loss of the life savings of retirees.  She was convicted on charges of conspiracy and securities, wire, and bank fraud following a 9-day trial.  Bennett was sentenced to 20 years of incarceration.

- ***United States v. Richard Shusterman*** (JKB-13-0460):  This investment fraud scheme that involved a loss of $171.383 million.  The defendant went to trial and received a sentence of 18 years of incarceration.

- ***United States v. Mark Gaver*** (RDB-17-0640):  Bank fraud scheme with a loss of $49.2 million to Santander Bank, N.A.  Gaver was sentenced to a term of 17 years of incarceration.

- ***United States v. Patrick Belzner*** (JFM-12-0103):  Investment fraud with losses of $22.4 million.  The defendant pled guilty and received a 15-year sentence.

- ***United States v. Byron Brown*** (WMN-09-0303):  Investment fraud case that involved a total loss of $9,830,111.  The defendant received a sentence of **180 months (15 years)** incarceration following a jury trial.

In light of the facts of this case and the cases listed above, the Government's recommended sentence would not cause any unwarranted sentencing disparities.

## VI.    RESTITUTION

The Wilsons should be ordered to pay restitution to:  (1) the individual victim investors; (2) the life insurance companies; and (3) the IRS.  The Mandatory Victim Restitution Act requires the Court to order restitution when a defendant is convicted of "an offense against property . . . including any offense committed by fraud or deceit," and "in which an identifiable victim" suffered a pecuniary loss.  18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B).  A victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  *Id.* § 3663A(a)(2).  "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664 (f)(1)(A).  The MVRA covers the defendants' mail and wire fraud convictions because they are crimes against property that were committed by fraud and deceit.  The defendants' convictions for tax crimes under Title 26 do not fall within the MVRA; however, restitution to the IRS can be ordered as a condition of supervised release under 18 U.S.C. § 3583(d) and § 3563(b)(2).  *See United States v. Blackwell*, 695 Fed. App'x 64, 66 (4th Cir. 2017).

This Court has authority to specify the manner in which restitution is to be paid.  18 U.S.C. § 3664(i).  The United States requests that the Court order that restitution payments be prioritized as follows: (1) individual investor victims, (2) life insurance companies, and (3) the IRS.

26

The Government calculated the restitution owed to the investor victims as indicated below. These are amounts that investors paid to the Wilsons believing they were legitimate loans or investments in life insurance policies, and for which the investor received no return.

| Investor | Investment | Legal Fees & Expenses[4] | Total Restitution |
|---|---|---|---|
| Tracey Wise | $175,400 | $9,680 | $185,080 |
| Sandra Ruhl | $379,100 | $5,421.99 | $384,521.99 |
| Whitaker Trust | $100,000 | $3,425 | $103,425 |
| Carrmen Motto | n/a | $3,570.00 | $3,570.00 |
| Jessica Merriam | $92,000 | N/A | $92,000 |
| **Total** | | | **$768,596.99** |

The Government calculated the restitution owed to the life insurance companies as indicated below. Total restitution owed is the payout less any premiums paid.

| Insurance Co. | Policy No. | Insured[5] | Death Payout | Premiums | Restitution |
|---|---|---|---|---|---|
| AXA | x1709 | TS | $1,002,625.13 | $73,979.90 | $928,645.23 |
| Americo | x3062 | TS | $246,391.34 | $91,564.00 | $154,827.34 |
| Americo | x8716 | TS | $351,880.05 | $17,763.30 | $334,116.75 |
| Americo | x8539 | JS | $100,000.00 | $38,700.00 | $61,300.00 |
| Americo | x6632 | JS | $153,359.28 | $57,400.00 | $95,959.28 |
| American General | x9388 | TS | $1,353,185.27 | $78,509.73 | $1,274,675.54 |
| American General | x2424 | JD | $1,541,857.19 | $110,700.00 | $1,431,157.19 |
| Fidelity & Guaranty | x8890 | TS | $107,721.25 | $12,452.00 | $95,269.25 |
| Fidelity & Guaranty | x9385 | TS | $152,933.53 | $20,634.53 | $132,299.00 |
| John Hancock | x4865 | TS | $1,004,570.49 | $52,031.80 | $952,538.69 |
| John Hancock | x4697 | TS | $2,330,977.00 | $96,720.00 | $2,234,257.00 |
| John Hancock | x1656 | JS | $1,545,106.02 | $68,699.00 | $1,476,407.02 |
| John Hancock | x1657 | JS | $514,181.51 | $22,004.00 | $492,177.51 |

---

[4] Under 18 U.S.C. § 3663A(b)(4), attorneys' fees incurred by a victim for the purpose of assisting the government's criminal investigation are recoverable as restitution. *See United States v. Afriyie*, 27 F. 4th 161, 173 (2d Cir. 2022).

[5] TS refers to Thomas Stevens, JS refers to John Stevens, and JD refers to James Demetro.

| John Hancock | x8700 | JD | $2,014,155.65 | $223,641.60 | $1,790,514.05 |
|---|---|---|---|---|---|
| Lincoln Benefit Life | x3920 | TS | $500,861.71 | $46,701.90 | $454,159.81 |
| Midland | x7788 | TS | $903,054.53 | $78,266.75 | $824,787.78 |
| Nationwide | x2630 | TS | $1,504,981.71 | $133,200.00 | $1,371,781.71 |
| Nationwide | x2890 | JS | $2,007,918.68 | $195,500.00 | $1,812,418.68 |
| Transamerica | x5238 | TS | $522,357.39 | $19,040.47 | $503,316.92 |
| Transamerica | x1139 | TS | $100,304.99 | $10,256.44 | $90,048.55 |
| Transamerica | x1140 | TS | $200,606.95 | $11,525.00 | $189,081.95 |
| Transamerica | x1141 | TS | $180,546.60 | $10,310.00 | $170,236.60 |
| Lincoln Financial | x6605 | TS | $90,864.46 | $26,300.00 | $64,564.46 |
| Lincoln Financial | x0769 | TS | $90,725.32 | $19,700.00 | $71,025.32 |
| Protective Life | x6859 | TS | $90,828.57 | $12,175.00 | $78,653.57 |
| Wilco Life | x6271 | TS | $108,478.01 | $19,250.00 | $89,228.01 |
| Wilco Life | x3736 | TS | $100,593.27 | $8,850.00 | $91,743.27 |
| Wilco | x3286 | JS | $105,201.98 | $13,375.00 | $91,826.98 |
| Jackson National | x0118 | TS | $205,173.40 | $11,705.00 | $193,468.40 |
| Jackson National | x8357 | TS | $100,666.87 | $13,750.00 | $86,916.87 |
| Jackson National | x7734 | JS | $106,219.36 | $4,200.00 | $102,019.36 |
| Jackson National | x0106 | JS | $206,151.24 | $8,650.00 | $197,501.24 |
| **Total** | | | | | **$17,936,923.33** |

The Government calculated the tax due and owing to the IRS as follows:

| Tax Year | Reported Income | Unreported Income – Insurance Checks | Adjustments to Income | Adjusted Taxable Income | Total Restitution |
|---|---|---|---|---|---|
| 2018 | $74,303.49 | $5,702,704 | $26,892 | $5,746,346 | $2,064,177 |
| 2019 | $56,971.38 | $2,007,919 | $38,643 | $2,050,867 | $696,644 |
| **Totals** | **$131,274.87** | **$7,710,623** | **$65,535** | **$7,797,213** | **$2,760,821** |

The Government's calculation for the total restitution owed to all victims is

**$21,466,341.32**.  The Government is submitting a separate restitution order to be entered with the

Judgment.

28

## VII.    CONCLUSION

For these reasons, the Government respectfully requests that the Court impose the sentences recommended above.  The Government's request as to forfeiture is being addressed through separate filings.

                              Respectfully submitted,

                              Kelly O. Hayes
                              United States Attorney

              By:    /s/
                              Matthew P. Phelps
                              Philip Motsay
                              Assistant United States Attorneys

                              Shawn T. Noud
                              Richard Kelley
                              Tax Division Trial Attorneys